IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JAMES MATT RIDING, an individual<br><br>Plaintiff,<br><br>v.<br><br>ARUP LABORATORIES, INC., a Utah corporation<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:10-cv-01111-DN<br><br>District Judge David Nuffer |

Table of Contents

STANDARD FOR SUMMARY JUDGMENT ............................................................................. 1

UNDISPUTED MATERIAL FACTS .................................................................................. 2

DISCUSSION ...................................................................................................... 6

    ADA VIOLATIONS: ACCOMMODATION & INTERACTIVE PROCESS ................. 6

    ADA VIOLATIONS: TERMINATION BASED ON DISABILITY ............................... 8

    FMLA VIOLATIONS: INTERFERENCE ...................................................... 12

    FMLA VIOLATIONS: RETALIATION ....................................................... 12

ORDER ......................................................................................................... 13

Defendant ARUP Laboratories, Inc. ("ARUP") has filed a motion for summary judgment[1] requesting dismissal of Plaintiff James Matt Riding's ("Riding") complaint.[2]  Riding alleges that ARUP violated the Americans with Disabilities Act ("ADA") and Family and Medical Leave Act ("FMLA") when ARUP terminated Riding in January of 2010.[3]  Specifically, Riding alleges ARUP failed to accommodate Riding's disability; failed to engage in an interactive process with Riding; and terminated Riding because of his disability.[4]  Furthermore, Riding alleges ARUP denied Riding's right to take leave under the FMLA, and Riding's termination was retaliation for eventually taking FMLA leave.[5]  Riding's complaint also alleges a claim of equitable estoppel, but Riding abandons this claim in his Memorandum in Opposition.[6]

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7]  In applying this standard, the Court must view facts "in the light most favorable to the nonmoving party."[8]  The opponent, however, "must do more than simply show that there is some metaphysical doubt as to the material facts,"[9] and where "the record taken as a whole could not

---

[1] Defendant's Motion for Summary Judgment, docket no. 17, filed January 31, 2012.

[2] Complaint, docket no. 2, filed November 9, 2010.

[3] *Id*. at 7-10.

[4] *Id*. at 7-8.

[5] *Id*. at 9-10.

[6] Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 10 (Opposition), docket no. 21, filed March 6, 2012

[7] Fed. R. Civ. P. 56(a).

[8] *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[9] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*,  475 U.S. 574, 586 (1986).

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"[10]

## UNDISPUTED MATERIAL FACTS

The following material facts are mostly undisputed in the briefing, but where facts offered by ARUP were disputed in Riding's response, those disputes have been removed by editing and the undisputed portions remain.

1.      ARUP hired Riding as a cytology supervisor in July 2006.[11]

2.      At all relevant times, Riding could perform all major functions of his job without a reasonable accommodation.[12]

3.      On three separate occasions in the summer of 2009, Riding inaccurately told his supervisor, Sandra Anthony ("Anthony"), that he had completed a job assignment, when in fact, he had not.[13]

4.      Anthony issued a written counseling record to Riding, on September 29, 2009, summarizing the three instances in which Riding had given her inaccurate information.[14]

5.      Immediately after receiving the September 29 Counseling, Riding emailed ARUP's Human Resources Office to inquire about "the possibility of stepping down as a supervisor."[15]

---

[10] *Id.* at 587.

[11] Opposition at vi.

[12] Memorandum in Support of Defendant's Motion for Summary Judgment (Support Memo) at vi, docket no. 18, filed January 31, 2012.  Riding disputes this fact, however, Riding completed an intake questionnaire at the Utah Antidiscrimination & Labor Division where he marked that he did not need accommodation to perform his job, and could perform all job functions without accommodation.  (Docket no. 18-11 at 3-4, filed January 31, 2012).

[13] Opposition at xiii.

[14] *Id.* at xv-xvi.  .

[15] *Id.* at xix.

6.      After Anthony received Riding's request to step down, Anthony met with Riding on October 1, 2009.  Riding explained to Anthony that he was having mental health issues and problems in his personal life.[16]

7.      Anthony discussed the option of leave with Riding at the October 1st meeting, if he needed time away from work, but Riding did not take leave at that time.[17]

8.      After Riding requested reassignment to a different position for a second time on November 10, 2009, ARUP searched available positions for Riding, but ARUP had no positions available for which Riding was qualified.[18]

9.      Riding received a second counseling record on November 11, 2009.  ARUP then placed Riding on probation and gave him the opportunity to identify any "other pending issues or problems" for which he would be given "amnesty."[19]

10.      Riding advised ARUP that there were no other deficiencies that he wished to identify for purposes of ARUP's amnesty offer.[20]

11.      After Riding received the November 11 counseling record, he visited with his physician and discussed going on leave.[21]

---

[16] Id. at xx.  Riding disputes this fact by alleging he disclosed his condition to his supervisors before this instance. The record does not support Riding's allegations.  The record indicates Riding first asked to step down on September 29, 2009, and then disclosed his condition during a conversation with Anthony on October 1, 2009. (Docket 21-2 at 78-80, 83, filed March 6. 2012).

[17] Id. at xxii.

[18] Id. at xix.  Riding disputes that there were no positions available for which he was qualified.  The record shows, however, that there were no available positions in his department.  Riding points out that there were available positions in the cytogenetics department, but that requires a different scientific knowledge than Riding's current department, cytopathology. (Docket no. 21-5 at 1-23, filed March 6, 2012).

[19] Id. at xxvi.  Riding raises a dispute about the purpose and timing of the amnesty offer, but does not dispute that he was placed on probation and given an offer of amnesty.

[20] Id.

[21] Id. at xxvii.  Riding disputes this fact without providing any evidentiary basis for the dispute.

12.     Riding then requested FMLA leave from ARUP, which ARUP promptly granted. On November 12, 2009, Riding began his FMLA leave.[22]

13.     Riding used some of his time on leave to look for employment elsewhere, contacting potential employers and recruiters.[23]

14.     By December 2009, Riding had made contact with LabCorp, a competing pathology facility in California, and eventually negotiated an offer of employment from LabCorp at a salary $20,000 above his current salary.[24]

15.     After Riding went on leave, Anthony took over Riding's responsibilities for managing the cytology department.  While performing Riding's job, Anthony discovered more errors committed by Riding before he began his leave that he did not identify in response to ARUP's amnesty offer.[25]

16.     For example, in a November 18, 2009 staff meeting led by Anthony, Anthony discovered that Riding's staff was not following an ARUP procedure that required that slides contain 100 to 200 cells per slide for a test known as the UroVysion Fish test.[26]

17.     Additionally, Anthony discovered that Riding had not ensured that quality control reports were "routed" through ARUP's document control system so that the important reports could be reviewed by the medical director.[27]

---

[22] *Id*.

[23] *Id*.  Riding disputes this fact, but Riding's deposition indicates he made contact with potential employers and recruiters while on leave.  (Docket no. 21-2 at 119-123, filed March 6, 2012).

[24] *Id*. at xxix.

[25] *Id*.  Riding disputes this fact by arguing the various discoveries made by Anthony concerned items of which she was already aware.  For reasons to be further explained, Riding's disputes are groundless.

[26] *Id*.  Riding disputes this fact by arguing Anthony was aware of this procedure in July 2009, implying she could have inquired about whether Riding's staff followed the procedure at an earlier time.  It is undisputed, however, that Riding's staff was not following ARUP's procedure.

18.     In addition, Anthony discovered that prior to going on leave Riding had failed to timely train his staff on a new Standard Operating Procedure ("SOP") for a test known as the Pancreatobiliary Fish test.[28]

19.     Anthony also discovered that Riding had not properly implemented a new SOP for operating a computer program upgrade on a computer-aided microscope known as the BioView that ARUP used to view slides.[29]

20.     Anthony had instructed Riding to ask an employee, Jenny Lancaster ("Lancaster"), whether she was working outside the company.  Riding told Anthony that he had spoken to Lancaster and that she reported she was not working outside the company.  Anthony later found that Riding never asked Lancaster whether she was working outside the company.[30]

21.     Riding received his termination notice on or about January 10, 2012.[31]

22.     About two weeks later, on January 26, 2010, Riding began employment with LabCorp.[32]

---

[27] *Id*. at xxxii.  Riding disputes this fact by blaming the failure on another employee.  The record indicates, however, that it was ultimately Riding's responsibility, as supervisor, to ensure reports were properly routed.  (Docket no. 21-3 at 67, filed March 6, 2012).

[28] *Id*. at xxxiv.  Riding disputes this fact for various reasons, but the record indicates Riding's staff was unfamiliar with the test, and it was Riding's responsibility to ensure his staff was familiar with the test.  (Docket no. 21-3 at 195, filed March 6, 2012).

[29] *Id*. at xxxvi.  Riding disputes this fact by arguing it is not mentioned in the termination record.  The termination record, however, does reference the improper BioView procedure.  (Docket no 27-14 at 1, filed April 3, 2012).

[30] *Id*. at xxxix-xl.  Riding disputes this fact by arguing he was unsure whether this request was made, but the record confirms it was.  (Docket no. 21-2 at 207-208, filed March 6, 2012).  Furthermore, Riding argues that Anthony's discovery from Lancaster that she was not asked is inadmissible hearsay.  The Federal Rules of Evidence, however, specifically note that statements made by an opposing party's agent or employee on a matter within the scope of that relationship and while it existed are not hearsay.  (Fed. R. Evid. 801(d)(2)(D)).

[31] *Id*. at xliii.

[32] *Id*. at xliv.

## DISCUSSION

## ADA VIOLATIONS: ACCOMMODATION & INTERACTIVE PROCESS

In order "to establish a prima facie case of discrimination under the ADA" the plaintiff "must show (1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability."[33]  ARUP does not challenge the first two elements, but denies Riding suffered discrimination as a result of his disability.

The parties dispute whether ARUP provided Riding with reasonable accommodation, and whether ARUP engaged in the interactive process with Riding in an effort to reasonably accommodate him.  "Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an … employee.'"[34]  Furthermore, "[t]he obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee."[35]  Riding alleges that ARUP failed to accommodate him and engage in the interactive process when ARUP rejected Riding's request for reassignment.[36]

Although Riding alleges ARUP failed to reasonably accommodate him, Riding did mark on his disability questionnaire for the Utah Antidiscrimination & Labor Division that he did not need reasonable accommodation in order to perform his job, and could perform all functions of

---

[33] *Koessel v. Sublette Cnty. Sheriff's Dep't.*, 2013 WL 1960568, at *3 (10th Cir. 2013).

[34] *Mayson v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004)(quoting 42 U.S.C. § 12112(b)(5)(A)).

[35] *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999).

[36] Opposition at 9.

his job without reasonable accommodation.[37]   Aside from Riding's own admission that he did

not need accommodation, ARUP alleges it provided Riding with the only accommodation he

requested, and engaged in an interactive process with Riding.[38]

Riding's first request for reassignment occurred in an email sent to his supervisors on

September 29, 2009.[39]   Riding's first request was in response to a counseling record he received

that same day.   Riding had not yet disclosed his disability to ARUP as of the time of his first

request for reassignment.   As the Tenth Circuit has noted "[i]n general, the interactive process

must ordinarily begin with the employee providing notice to the employer of the employee's

disability and any resulting limitations."[40]   At the moment of Riding's first request for

reassignment he had not notified ARUP of his disability, and ARUP had no duty to engage in an

interactive process with Riding.

Riding eventually disclosed his disability to his supervisors in a meeting on October 1,

2009.[41]   Then, in a November 10, 2009 email, Riding again requested reassignment.[42]   At this

point, Riding's request for reassignment would trigger ARUP's participation in the interactive

process.[43]   ARUP would have a "duty to reassign,"[44] but "only when it is reasonable under the

circumstances"[45] and only to "existing vacant positions."[46]   ARUP searched for available

---

[37] Docket no. 18-11 at 3-4.

[38] Support Memo at 2.

[39] Docket no. 18-16.

[40] Midland Brake, 180 F.3d at 1171.

[41] Opposition at xx.   This fact was incorrectly disputed by Riding.   *See supra* p. 3 and note 16.

[42] Docket no. 18-17.

[43] Koessel, 2013 WL 1960568, at *5.

[44] *Id*. at 6.

[45] *Id*.

[46] *Id*.

positions for which Riding was qualified within his department, but there were none available.[47]

Riding has "the burden of identifying a specific vacant position to which he could have

reasonably been reassigned."[48]   Although Riding does identify vacant positions within ARUP, he

could not have reasonably been reassigned to these positions because they were outside his

department, and he was not qualified.  Furthermore, ARUP discussed the option of leave with

Riding when he disclosed his disability.[49]

    In addition to Riding's request for reassignment, he also requested to take leave, which

ARUP promptly granted.[50]   ARUP's conduct indicates it engaged in the interactive process with

Riding when ARUP initially introduced the option of leave to Riding, and when ARUP searched

available positions for Riding in response to his request for reassignment. Moreover, ARUP

reasonably accommodated Riding when ARUP immediately granted Riding's request for leave.

## ADA VIOLATIONS: TERMINATION BASED ON DISABILITY

    Riding argues that ARUP terminated him based on his disability, and that any reasons for

termination provided by ARUP are pretext for discrimination.[51]   As mentioned previously, the

third prong necessary to establish a prima facie case of disability discrimination requires the

plaintiff to demonstrate that "he suffered discrimination as a result of his disability."[52]   That is,

"a plaintiff generally must show that he has suffered an 'adverse employment action because of

the disability.'"[53]   Assuming Riding has made a prima facie case of discrimination, the burden-

---

[47] Opposition at xix.  This fact was incorrectly disputed by Riding.  *See supra* p. 3 and note 18.

[48] Koessel, 2013 WL 1960568, *6.

[49] Opposition at xxii.  This fact was incorrectly disputed by Riding.  *See supra* p. 3 and note 17.

[50] Opposition at xxvii.

[51] *Id*. at 2.

[52] Koessel, 2013 WL 1960568, at *3.

[53] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011)(quoting *Matthews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).

shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*[54] would require ARUP to provide "legitimate, non-discriminatory reasons for its actions."[55]  Then Riding would need to "show that the defendant's stated reasons are merely 'pretextual.'"[56]

ARUP provides six legitimate reasons for Riding's termination: (1) Riding's failure to inform his department about ARUP's guidelines that required adequate cellularity on slides used in UroVysion Fish tests, resulting in his staff not following the proper procedure; (2) Riding's failure to route quality control reports after October 11, 2009; (3) Riding's failure to provide his staff with the SOPs for the Pancreatobiliary Fish test in time for the November 16, 2009 "go live" date for the test; (4) Riding's failure to properly implement a new SOP for operating a computer program upgrade on the BioView microscope, his failure to train his staff on the SOP, and his failure to address maintenance problems with the BioView; (5) Riding's inaccurate statement to Anthony that Lancaster was not working outside ARUP; and (6)  allowing his employees to work weekends when it was not necessary, a practice that cost ARUP additional revenue because of the increased weekend wage.[57]

In response to ARUP's reasons for termination, Riding can "establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[58]  Riding makes several arguments that ARUP's termination reasons are pretextual. First, Riding argues that the temporal proximity between the disclosure of his disability, taking

---

[54] 411 U.S. 792 (1973).

[55] C.R. England, 644 F.3d at 1038.

[56] *Id*. (quoting McDonnell Douglas, 411 U.S. at 804-05).

[57] Support Memo at 4-5.

[58] *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211, (10th Cir. 2010)(quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

leave, and his termination supports an inference of pretext.[59]  Second, Riding argues ARUP

conducted a flawed or cursory investigation leading to his termination, supporting an inference

of pretext.[60]  Third, Riding argues the delay between his alleged infractions and poor

performance and his termination support an inference of pretext.[61]  Lastly, Riding argues his

supervisor increased her supervision over him, which supports an inference of pretext.[62]

      In Riding's first argument regarding temporal proximity he quotes *Metzler v. Fed. Home

Loan Bank of Topeka*[63], a Tenth Circuit case which notes that temporal proximity plus

circumstantial evidence of retaliatory motive is sufficient to establish pretext.[64]  Riding's pretext

arguments, however, are unpersuasive, and thus do not serve as circumstantial evidence of a

retaliatory motive.  Riding's argument that ARUP conducted a flawed or cursory investigation is

similarly unpersuasive.  Riding alleges that ARUP conducted a flawed investigation because

ARUP did not receive Riding's version of events before termination.  In support of this argument

Riding relies on a Tenth Circuit case, *DeFreitas v. Horizon Investment Management Corp.*[65] that

is distinguishable.  In *DeFreitas*, the Court noted that a jury might find it strange that a

supervisor would fire an employee based on comments by subordinates without first asking the

employee for her version of events.[66]  ARUP persuasively argues that *DeFreitas* is inapplicable

because Riding's termination was not based on comments by subordinates, but by "observations

---

[59] Opposition at 3.

[60] *Id*.

[61] *Id*. at 5.

[62] *Id*. at 6.

[63] 464 F.3d 1164 (10th Cir. 2006).

[64] Opposition at 3.

[65] 577 F.3d 1151 (10th Cir. 2009).

[66] *Id*. at 1161.

personally made by Anthony."[67] Furthermore, unlike *DeFreitas*, Riding had been disciplined before his supervisor ultimately discovered the flaws leading to his termination. The evidence does not support a finding of a flawed or cursory investigation, and thus does not support an inference of pretext.

Next, Riding argues the lengthy delay between his alleged infractions and his termination support an inference of pretext. Riding fails to cite any persuasive authority to support his argument, instead relying on *Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept.*[68], a Seventh Circuit case which is factually distinguishable.[69] In *Peirick*, the Court found pretext after the employer demonstrated a "pattern of delay"[70] between when an employee's alleged infractions occurred and when the employer addressed those infractions. In the present case there has been no pattern of delay exhibited by ARUP. Additionally, Riding's argument fails because although Riding may have committed the errors months before his termination, the errors were not discovered until Riding's supervisor took over his duties in November and December of 2009. Riding was then terminated in early January 2010. The time between discovering Riding's errors and his termination was not lengthy, and thus ARUP's actions do not support a finding of pretext.

Lastly, Riding alleges he was the recipient of increased supervision by his supervisor, which supports a finding of pretext. Riding again fails to support this argument with any persuasive authority, ultimately relying on *Hamilton v. General Elec. Co.*[71], a Sixth Circuit case that is distinguishable. Furthermore, the Tenth Circuit has held that no precedent supports the

---

[67] Support Memo at 8.

[68] 510 F.3d 681 (7th Cir. 2007).

[69] Opposition at 5.

[70] *Peirick*, 510 F.3d at 693.

[71] 556 F.3d 428 (6th Cir. 2009).

argument that "being subject to heightened scrutiny constitutes evidence of pretext."[72]  The

record does not support Riding's allegation that his supervisor "was trying to run him out of

ARUP,"[73] and in any event, the alleged increased supervision would not constitute a finding of

pretext.

## FMLA VIOLATIONS: INTERFERENCE

Riding alleges that ARUP interfered with and denied his right to take leave under the

FMLA.[74]  The Tenth Circuit has held that:

> To establish an FMLA interference claim, "the plaintiff must demonstrate:
> (1) that . . . she was entitled to FMLA leave, (2) that some adverse action by the
> employer interfered with . . . her right to take FMLA leave, and (3) that the
> employer's action was related to the exercise or attempted exercise of [her] FMLA
> rights."[75]

Riding does not support his argument with any legal analysis.  Additionally, there is no evidence

in the record to indicate ARUP ever prevented or interfered with Riding's ability to take FMLA

leave.  When Riding eventually requested FMLA leave, ARUP promptly granted his request.

Riding has failed to demonstrate "that some adverse action by [ARUP] interfered with . . . [his]

right to take FMLA leave."[76]

## FMLA VIOLATIONS: RETALIATION

Riding advances the same argument for his retaliation claim as he used for his ADA

discrimination claim.[77]  For Riding "[t]o state a prima facie case of retaliation" he must show

that: (1) he "engaged in protected activity"; (2) ARUP "took an action that a reasonable

---

[72] *Green v. New Mexico*, 420 F.3d 1189, 1195 (10th Cir. 2005).

[73] Opposition at 6.

[74] Complaint ¶¶ 65-66 at 10.

[75] *DeFreitas*, 577 F.3d at 1159. (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006)).

[76] *Id*.

[77] Opposition at 2.

employee would have found materially adverse;" and (3) "there exists a causal connection between the protected activity and the adverse action."[78]  Riding meets his burden under the first two elements when he engaged in a protected activity by taking FMLA leave and when ARUP terminated Riding.  It is not clear that the third element – whether a causal connection exists between the protected activity and the adverse action – is met.  Assuming, however, that Riding establishes his prima facie case with his proximity argument,[79] the next step would be to continue with the burden shifting analysis as previously discussed in this case for the ADA discrimination claim.[80]  For the same reasons previously articulated under Riding's ADA discrimination claim,[81] Riding's retaliation claim fails.  In other words, Riding's pretext arguments regarding temporal proximity, flawed or cursory investigations, and delay between infractions and termination, are unpersuasive for the same reasons discussed earlier.

## ORDER

Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment[82] on all claims is GRANTED.  The clerk shall close the case.

Signed June 14, 2013.

BY THE COURT

District Judge David Nuffer

---

[78] *Metzler*, 464 F.3d at 1171.

[79] *Metzler* recognized that temporal proximity between the protected conduct and termination can fulfill the plaintiff's burden in establishing the third element of a prima facie case for FMLA retaliation. (*Id.*).

[80] *See supra* pp. 8-12.

[81] *Id*.

[82] Docket no. 17, filed January 31, 2012.